## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHRISTOPHER JOHNSON**                                    **CIVIL ACTION**

**VERSUS**                                                          **NO. 19-12957**

**DARRYL VANNOY**                                          **SECTION: "F"(1)**

### REPORT AND RECOMMENDATION

Petitioner, Christopher Johnson, a Louisiana state prisoner, filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that his application be **DISMISSED WITH PREJUDICE**.

Pursuant to Louisiana law, petitioner and Kelvin C. Thomas were indicted on a charge of first degree murder.[1] On November 19, 2003, pursuant to a plea agreement, petitioner then pleaded guilty to a lesser charge of manslaughter and was sentenced to a term of twenty years imprisonment.[2] However, that plea and plea agreement were subsequently withdrawn and his conviction was set aside on March 29, 2011.[3] Thereafter, he was tried before a jury and convicted of second degree murder under Louisiana law on October 30, 2014.[4] On December 3, 2014, he was then sentenced on that conviction to term of life imprisonment without benefit of parole, probation, or suspension of sentence.[5] On December 23, 2015, the Louisiana First Circuit Court

---

[1] Rec. Doc. 16-1, p. 23 (indictment).
[2] Id. at pp. 10-11 (minute entry); Rec. Doc. 16-2, pp. 56-70 (transcript).
[3] Rec. Doc. 16-4, pp. 34-43 (transcript). See also Rec. Doc. 16-1, pp. 151-57 ("Motion to Withdraw a Guilty Plea") and 191-93 ("Motion to Withdraw from State's Plea Agreement with Defendant").
[4] Rec. Doc. 16-1, pp. 20-21 (minute entry) and 235-36 (verdict form); Rec. Doc. 16-3, p. 268 (transcript).
[5] Rec. Doc. 16-1, pp. 21-22 (minute entry); Rec. Doc. 16-4, p. 19 (transcript).

of Appeal affirmed his conviction and sentence,[6] and the Louisiana Supreme Court denied his related writ application on February 3, 2017.[7]

Petitioner thereafter filed an application for post-conviction relief with the state district court.[8] That application was denied on June 20, 2018.[9] His related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on October 29, 2018,[10] and the Louisiana Supreme Court on August 12, 2019.[11]

Petitioner then filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[12] Respondent filed an answer conceding that petitioner's federal application is timely and that he exhausted his remedies in the state courts; however, respondent argues that petitioner's claims fail on the merits.[13] Petitioner filed a reply.[14]

### I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the

---

[6] State v. Johnson, 185 So. 3d 822 (La. App. 1st Cir. 2015).
[7] State v. Johnson, 215 So. 3d 688 (La. 2017).
[8] Rec. Doc. 16-4, pp. 58-63 (supplement brief) and 82-101 (application).
[9] Id. at pp. 53-54 (Order).
[10] State v. Johnson, No. 2018 KW 1220, 2018 WL 5503674 (La. App. 1st Cir. Oct. 29, 2018).
[11] State v. Johnson, 279 So. 3d 371 (La. 2019); State v. Johnson, 279 So. 3d 927 (La. 2019).
[12] Rec. Doc. 1.
[13] Rec. Doc. 16.
[14] Rec. Doc. 22.

merits by the state court), cert. denied, 140 S. Ct. 2676 (2020). The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to

> extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## II. Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> On March 26, 2001, Vincent Bacile (the victim) was shot to death during an attempted armed robbery by two men at the Piggly Wiggly grocery store in Independence, Louisiana. The attempted armed robbery and subsequent shooting occurred after the store had closed for the evening, and while several employees were performing their routine nightly tasks.
>
> Prior to the shooting, Bacile and another employee, Gary Matthews, were talking with Roy Navarra, a part owner of the Piggly Wiggly, in the rear of the store. As the men talked, a masked individual appeared behind Bacile and began to strike him with a lug wrench.[FN 4] Soon thereafter, a second perpetrator appeared and held a gun to the back of Navarra's head. The perpetrators began to march the store employees to the stock room. After everyone reached the stock

room, Bacile ran to the front of the store and began yelling for someone to call 911. Both perpetrators followed behind him. During the ensuing chase, the victim was shot and killed by a single gunshot wound to his neck. Following the shooting, at least one of the perpetrators tried unsuccessfully to break into the store's office, where two other employees had hidden. Defendant, Johnson, was apprehended on the evening of the incident. He later gave a statement to the police in which he admitted his involvement, but stressed that no one was supposed to get hurt during the robbery.

[FN 4] This item was also described at trial as a "crowbar."[15]

In addressing petitioner's direct-appeal claims, the Court of Appeal further summarized the trial

testimony as follows:

Defendant did not testify at trial. The facts of the incident were described to the jury primarily through the testimony of Roy Navarra and Tangipahoa Parish Sheriff's Detective Gary Baham, (who took defendant's statement). Roy Navarra testified that two perpetrators were involved in the incident – one who was armed with a lug wrench (defendant) and one who was armed with a gun (Kelvin Thomas). He explained that both men ran after the victim once he fled toward the front of the store. At that point, he and Gary Matthews exited the store through its rear door. As they were doing so, he heard a gunshot. Mr. Navarra described seeing both men running together from the front of the store to the back of the store, heading toward a nearby trailer park.[FN 6]

[FN 6] Mr. Navarra's wife, Barbara, also testified at trial regarding some of the facts of the incident, but she never saw either perpetrator because she hid in the locked office they attempted to enter. While she heard the gunshot, she did not witness the shooting.

Detective Baham testified at trial regarding the statement defendant gave following his arrest. After defendant was arrested and informed of his Miranda [FN 7] rights, he agreed to speak to Detective Baham. In this statement, defendant described that he and his accomplice hid in the Piggly Wiggly store for a few hours prior to the robbery. Once the store closed, he and Thomas intended to tie up any store employees using duct tape in order to rob the store. Defendant described to Detective Baham that the victim took a "heroic action" and spun to confront him, so defendant hit him several times with the lug wrench. During this struggle, the victim apparently took the lug wrench from defendant's possession. When the victim subsequently ran toward the front of the store, both defendant and his accomplice ran after him. Defendant told Detective Baham that, at that point, Mr. Navarra began to run in a different direction. Defendant split from his accomplice

---

[15] State v. Johnson, 185 So.3d 822, 825-26 (La. App. 1st Cir. 2015).

and began to pursue Mr. Navarra. When defendant heard the gunshot, he ran back to the front of the store. There, he and his accomplice began to hit the office window in an attempt to gain entry, but they were unsuccessful. They ultimately fled through the store's front door.

[FN 7]   Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[16]

The Court of Appeal then further observed:

At trial, James Holden testified that on July 9, 2003, he was tasked with cleaning up a burned trash pile in a trailer park in Independence. In doing so, he found what appeared to be a burned firearm. Raymond Jackson, of the Independence Police Department, collected the weapon from the debris pile and gave it to the Tangipahoa Parish Sheriff's Office.

Pat Lane, a firearms expert from the Louisiana State Police Crime Lab, cleaned the recovered gun and used pieces from a reference weapon to return the gun to a condition in which it was able to be test fired. He explained at trial that the critical "working parts" for the test fire were those that would have been used on the night of the shooting. He found that a spent .22 caliber cartridge casing recovered near the victim's body matched a casing that he test fired using the recovered weapon.[17]

### III.  Petitioner's Claims

### A.  Confrontation Clause

Petitioner claims that he "was denied the right to confront his accuser and cross examine the analyst who performed the DNA test that convicted him."[18]  Specifically, during the investigation, police recovered several items of clothing worn by the perpetrators during crime, including a Halloween mask.[19]  The items were later tested for DNA, and, of import here, Julia Naylor Kirk testified at trial that DNA recovered from the mask had been analyzed and found to

---

[16] Id. at pp. 827-28.
[17] Id. at p. 829.
[18] Rec. Doc. 1-1, p. 3.
[19] See Rec. Doc. 16-3, p. 86 (transcript).

match petitioner's DNA profile.[20]  Petitioner contends that Kirk's testimony violated his rights

under the Confrontation Clause, arguing:

> Petitioner argues that he was denied the right to confrontation or cross examination where his convicted [sic] was partly based on DNA tests but no one could say that these tests were performed accurately.  The DNA tests were performed by an analyst, Tasha Poe, who did not testify.  Ms. Poe did not testify.  Julia Naylor only reviewed the report she admitted she never personally examined the Halloween mask with Petitioner's DNA.  The Halloween mask was the one unique item directly linked to the crime.[21]

In denying that claim on direct appeal, the Louisiana First Circuit Court of Appeal held:

> [D]efendant argues that his Sixth Amendment right to confront his accuser was violated at trial.  Particularly, he argues that the testimony of a DNA analyst who did not perform any testing, but simply reviewed the report of another analyst, violated his right to cross-examine a witness against him.
>
> Julia Naylor Kirk, a DNA analyst with the Louisiana State Police Crime Lab, testified at trial regarding DNA evidence linking defendant to some clothing and a Halloween mask recovered from an area near the Piggly Wiggly.  Defendant argues that Ms. Kirk should not have been allowed to testify at trial because another analyst, Natasha Poe, actually performed the DNA tests and generated the report.
>
> First, we point out a discrepancy between defendant's claim – that Natasha Poe alone conducted the DNA comparison tests – and Ms. Kirk's testimony that she performed the comparisons.  Nonetheless, we note several instances in Ms. Kirk's testimony where she appears to state that Ms. Poe did some of the testing.
>
> Regardless of which analyst performed the testing, the record is clear that defendant never made a written or oral objection to any part of Ms. Kirk's testimony regarding the DNA testing, including a confrontation objection.  In order to preserve the right to appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection.  La. Code Crim. P. art. 841(A).  A new basis for an objection may not be raised for the first time on appeal.  The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem.  It is also intended to prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection.  See State v. McClain, 2004-0098 (La.App. 5th Cir. 6/29/04), 877 So.2d 1135, 1144, writ denied, 2004-1929 (La. 12/10/04), 888 So.2d 835.  See also State v. Young, 99-1264 (La.App. 1st Cir. 3/31/00), 764 So.2d 998, 1005.

---

[20] See id. at pp. 124-25 (transcript).
[21] Rec. Doc. 1-1, p. 4.

This assignment of error was not properly reserved for appellate review.[22] The Louisiana Supreme Court then denied petitioner's related writ application without assigning reasons.[23]

In his answer in this proceeding, respondent notes in passing that this claim was denied in state court due to the lack of a contemporaneous objection.[24]  However, for reasons that are not immediately apparent, respondent does not then proceed to argue that the claim is therefore procedurally barred from federal review;[25] rather, he instead focuses his argument on a contention that the claim lacks merit.  Because respondent did not raise or argue the procedural bar, and because a federal court is not required to raise that defense on a respondent's behalf, see Trest v. Cain, 522 U.S. 87 (1997), the undersigned will likewise address petitioner's claim on the merits. However, as respondent correctly notes, the claim does indeed fail on the merits.

Although DNA testing was performed on several pieces of evidence in the instant case, petitioner's Confrontation Clause claim concerns only the testing of the Halloween mask.

---

[22] State v. Johnson, 185 So. 3d 822 (La. App. 1st Cir. 2015).
[23] State v. Johnson, 215 So. 3d 688 (La. 2017).
[24] Rec. Doc. 16, pp. 6 and 9.
[25] The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must clearly and expressly indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.  This rule applies to state court judgments on both substantive and procedural grounds. Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations and quotation marks omitted). Here, the state courts denied this claim as defaulted due to the lack of a contemporaneous objection.  The United States Fifth Circuit Court of Appeals has held that Louisiana's contemporaneous objection rule is an independent and adequate state procedural rule to support a procedural bar in federal court. Duncan v. Cain, 278 F.3d 537, 541-43 (5th Cir. 2002).

Regarding the conclusion that petitioner's DNA was found on that mask, the parties disagree concerning the extent to which Julia Naylor Kirk, the analyst who testified at trial, was actually involved in the DNA testing and analysis of that evidence. Petitioner opines that Kirk "played no part in the DNA testing";[26] rather, he suggests that the actual testing was in fact performed by Kirk's subordinate, Tasha Poe. In his answer, respondent counters that petitioner's argument is based on a "misconstruction of the underlying facts."[27] Respondent further argues that there was no Confrontation Clause violation because the record shows that Kirk performed the analysis concluding that the DNA on the mask was consistent with petitioner's DNA profile, issued the DNA comparative analysis report, and testified at trial concerning her findings subject to cross-examination.

The transcript supports respondent's argument. That transcript shows that Kirk expressly testified that she analyzed the DNA reference sample from a buccal swab obtained from petitioner[28] and concluded that the sample matched the DNA evidence taken from the Halloween mask. Specifically, she testified:

Q.    So 24-A and 25-A were the known buccal swab reference samples from Christopher Johnson and Kelvin Thomas, correct?

A.    Correct?

Q.    Which of those profiles that you developed were you able to match to Christopher Johnson?

A.    Three stains on the pants, Exhibits 1-B through 1-D, and the swab collected from the mouth area of the Halloween mask, Exhibit 6-D, were consistent

---

[26] Rec. Doc. 1-1, p. 5.
[27] Rec. Doc. 16, p. 8.
[28] Rec. Doc. 16-3, p. 121 ("[T]he reference samples from Christopher Johnson and Kelvin Thomas were made by myself.")

with the DNA profile obtained from the reference sample from Christopher
Johnson.[29]

When Kirk was then questioned about Poe's connection to the tests, Kirk explained that the DNA

reference sample from the mask was taken and profiled by Poe:

> Q.     … Do you recollect that mask at all?
>
> A.     *I didn't exactly – didn't examine that mask personally.  That was examined by Tasha Poe.*
>
> Q.     Okay.  Tasha Poe was the – was an analyst at your office?  You and she, at that time, would it be correct to say, worked together on this case?
>
> A.     Yes.
>
> Q.     Okay.   And, at some point, did she leave the crime laboratory to go elsewhere?
>
> A.     Yes.  I had actually left the state police lab to work for the Federal Bureau of Investigation in Quantico, Virginia.  I came back in 2007, and she left shortly thereafter in – I came back in April, and she left in May.
>
> Q.     Is it correct to say that you had examined all of her work and even participated in it?
>
> A.     Yeah.  And I reviewed the entire case file in its entirety on January the 17th of 2009.
>
> Q.     Okay.  And she was gone by then?
>
> A.     Yes, she was.
>
> Q.     All right.  *And the results that you've testified to here today are essentially, at this point, your results, as well?*
>
> A.     *Correct.  I issued the report.*[30]

On cross-examination, Kirk further testified:

---

[29] Id. at pp. 124-25.
[30] Id. at p. 129 (emphasis added).

11

Q.      …  Did you reanalyze the work, or did you just review the work that she did?

A.      *I reviewed the work that she had done, and I conducted some additional analysis myself on some of those items and I made the comparisons between the known samples to the evidence profiles that she had generated.*

Q.      And it matched what she had come up with; is that correct?

A.      Correct.[31]

In summary, the implication of that testimony is that Poe developed the reference profile of the DNA from the mask, while Kirk developed the reference profile of the DNA from petitioner's buccal swab.  However, importantly, it was *Kirk* who then *compared the two profiles and concluded* that, based on *her personal comparative analysis*, that the probability that someone other than petitioner left the DNA on the mask was "approximately 1 in 338 trillion."[32]

The question, therefore, is whether the Confrontation Clause required the prosecution to call Poe to testify at trial subject to cross-examination simply because she developed the reference profile of the DNA from the mask – the profile that was then later used by Kirk when she made her comparison and issued her findings.  For the following reasons, the undersigned finds that the Confrontation Clause is not so exacting.

Petitioner argues that Bullcoming v. New Mexico, 564 U.S. 647 (2011), mandates the contrary conclusion.  It does not.

In Bullcoming, the United States Supreme Court held:

> The Sixth Amendment's Confrontation Clause confers upon the accused, "[i]n all criminal prosecutions, ... the right ... to be confronted with the witnesses against him."  In a pathmarking 2004 decision, Crawford v. Washington, we overruled Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980),

---

[31] Id. at p. 141 (emphasis added).
[32] Id. at p. 125.

which had interpreted the Confrontation Clause to allow admission of absent witnesses' testimonial statements based on a judicial determination of reliability. See id., at 66, 100 S.Ct. 2531. Rejecting Roberts' "amorphous notions of 'reliability,'" Crawford, 541 U.S., at 61, 124 S.Ct. 1354, Crawford held that fidelity to the Confrontation Clause permitted admission of "[t]estimonial statements of witnesses absent from trial ... only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," id., at 59, 124 S.Ct. 1354. See Michigan v. Bryant, 562 U.S. 344, 354, 131 S.Ct. 1143, 1153, 179 L.Ed.2d 93 (2011) ("[F]or testimonial evidence to be admissible, the Sixth Amendment 'demands what the common law required: unavailability [of the witness] and a prior opportunity for cross-examination.'" (quoting Crawford, 541 U.S., at 68, 124 S.Ct. 1354)). Melendez–Diaz, relying on Crawford's rationale, refused to create a "forensic evidence" exception to this rule. 557 U.S., at 317-321, 129 S.Ct., at 2536-2538. An analyst's certification prepared in connection with a criminal investigation or prosecution, the Court held, is "testimonial," and therefore within the compass of the Confrontation Clause. Id., at 321-324, 129 S.Ct. at 2537-2540.

Bullcoming, 564 U.S. at 658-59. The Supreme Court therefore concluded: "[T]he analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" Id. at 661 (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 319-20 n.6 (2009)).

Bullcoming, however, is distinguishable from the instant case. In Bullcoming, the defendant was charged with driving while intoxicated. The Supreme Court noted:

> Principal evidence against Bullcoming was a forensic laboratory report certifying that Bullcoming's blood-alcohol concentration was well above the threshold for aggravated DWI. At trial, the prosecution did not call as a witness *the analyst who signed the certification, [Curtis Caylor]*. Instead, the State called *another analyst, [Gerasimos Razatos,]* who was familiar with the laboratory's testing procedures, but had *neither participated in nor observed the test* on Bullcoming's blood sample.

Id. at 651 (emphasis added). The Supreme Court concluded that the Confrontation Clause was violated under that scenario, because "[t]he accused's right is to be confronted with *the analyst who made the certification*, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." Id. at 652 (emphasis added).

13

"[W]hen the State elected to introduce Caylor's certification, Caylor became a witness Bullcoming had the right to confront." Id. at 663.

What occurred in the instant case is not comparable. Here, Kirk compared the samples from the mask and petitioner's buccal swab; Kirk concluded that they matched; Kirk issued the DNA report; and Kirk testified at trial concerning her findings subject to cross-examination. Bullcoming's holding is not necessarily so expansive that it necessarily follows that this scenario likewise violates Confrontation Clause; rather, Bullcoming's holding was much more limited. See Grim v. Fisher, 816 F.3d 296, 310 (5th Cir. 2016) ("*[A]t most*, Bullcoming holds that if scientist A performed the test, the prosecution cannot prove a particular fact contained in scientist A's testimonial certification by offering the in-court testimony of scientist B, *if scientist B neither signed the certification nor performed or observed the test. But Bullcoming does not hold that scientist B cannot testify even if he has a sufficient degree of involvement with the forensic testing.*" (emphasis added)).

In effect, petitioner is arguing that Bullcoming's analysis should be applied in a broader range of scenarios and expanded to require that when the prosecution presents evidence concerning a DNA comparative analysis, then *all* individuals who played a part in the collection and analysis of the evidence must be called to testify at trial. Interestingly, that is precisely the type of argument that the dissenting justices in Bullcoming feared would result from the majority's opinion. See id. at 680 (Kennedy, J., dissenting). However, in her concurrence in Bullcoming, Justice Sotomayor dismissed that fear as overstated. See id. at 670 n.2 (Sotomayor, J., concurring) ("This is not to say, however, that every person noted on the [blood alcohol concentration] report must testify. … [I]t is not the case that anyone whose testimony may be relevant in establishing the chain of

custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.  It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence." (quotation marks and ellipsis omitted)).  Both federal and state courts have since likewise concluded that is not what Bullcoming demands.  See, e.g., Williams v. Vannoy, 669 F. App'x 207, 208 (5th Cir. 2016) ("Here, the supervisor of the DNA laboratory testified as an expert who had a personal connection to the scientific testing and actively reviewed the results of the forensic analyst's testing and signed off on the report.  The supervisor thus was able to testify to the results without violating the confrontation rights of Williams."); Lopez v. Wall, Civ. Action No. 13-451, 2014 WL 5589438, at *1 (D.R.I. Nov. 3, 2014) ("[T]he instant case is clearly distinguishable from Bullcoming.  Lopez incorrectly argues that the supervisor who testified against him lacked personal knowledge of the actual testing of evidence.  To the contrary, … the witness who testified against Lopez performed the critical stage of the DNA analysis by drafting the report and had personal knowledge of the lab analysts' procedures.  Importantly, the lab supervisor who testified against Lopez examined the notes and raw data of his analysts, and drew his own conclusions.  These conclusions were memorialized in an independent report.  Thus, the lab supervisor was present at trial to be cross-examined about his own conclusions and no violation of the Sixth Amendment Confrontation Clause occurred." (citation and quotation mark omitted)); see also Phillips v. State, 285 So. 3d 685, 690 (Miss. Ct. App.), cert. denied, 284 So. 3d 754 (Miss. 2019); Garrett v. State, 518 S.W.3d 546 (Tex. Ct. App. 2017).

For these reasons, the Court finds that Kirk was a proper witness to testify, subject to cross-examination, concerning *her* analysis and the report *she* issued and, further, also finds that the

Confrontation Clause was *not* violated by the state's failure to also call Poe concerning her limited and preliminary work which was later utilized by Kirk as part of her independent analysis.

## B.  Ineffective Assistance of Counsel

Petitioner next claims that he received ineffective assistance of counsel.  Specifically, he claims that his trial counsel was ineffective for failing to (1) "move to suppress the DNA evidence obtained from the Petitioner without a search warrant," (2) "move to suppress the statement where the Miranda warnings given in the aftermath of the interrogation did not lead the defendant to know that he had a genuine right to remain silent," and (3) "object to the confrontation violation when the DNA expert who did not conduct the examination testified to the results."[33]  He further claims that he received ineffective assistance of counsel by virtue of the fact that one of the attorneys who represented him at trial, Vanessa Williams, labored under a conflict of interest, given that she had previously served as a prosecutor in the case.[34]  Lastly, he claims that his appellate counsel was also ineffective for "failing to argue meritorious claims."[35]

The United States Supreme Court has established a two-prong test for evaluating such claims.  Specifically, a petitioner seeking relief on such a claim is required to show *both* that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984).  The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that the petitioner has made an insufficient showing as to either of the

---

[33] Rec. Doc. 1-1, p. 4.
[34] Id.
[35] Id.

two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must consider the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a

17

reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000). Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error. Briseno, 274 F.3d at 210.

In the instant case, petitioner asserted his ineffective assistance of counsel claims on collateral review, and the state courts denied those claims on the merits. The state district court expressly addressed the claims concerning trial counsel, holding:

> Mover's initial assertion is that counsel was ineffective in failing to file a motion to suppress DNA evidence obtained through an oral swab of Mover's saliva, which sample matched the DNA found on certain discarded clothing found near the crime scene. Mover alleges that this DNA swab was not obtained pursuant to a search warrant and that a motion to suppress should have been filed. However, the record shows that a court order to obtain the DNA swab was issued on August 13, 2009. Accordingly, this contention is without merit.
>
> Mover next asserts that counsel was ineffective in failing to file a motion to suppress a statement given to law enforcement. The record reflects that a motion to suppress was filed and heard in proceedings preliminary to the present prosecution. Therefore, this contention is further without merit.
>
> Finally, Mover urges a conflict of interest, in that his co-counsel at trial, Vanessa Williams, had a conflict in that she was previously employed by the district attorney's office. While Mover asserts that Ms. Williams played some integral role in the investigation leading to his prosecution, there is no allegation as to what, if any, role she may have actually played. Moreover, if Ms. Williams had any information as to the evidence or strategy of the prosecution while formerly employed by the district attorney's office, it would stand to reason that this information would probably have been more beneficial to the defense, and any conflict would arise as to the prosecution. However, there is no showing that there was ever any involvement by Ms. Williams personally in Mover's case as a prosecutor, and the minutes reflect that the assistant district attorney handling the

matter was always someone other than Ms. Williams.   Therefore, the Court finds no merit to this contention.[36]

In denying petitioner's related writ application, the Louisiana First Circuit Court of Appeal further held:

> **WRIT DENIED.**  If the substantive issue an attorney failed to raise has no merit, then the claim the attorney was ineffective for failing to raise the issue has no merit.  **State ex rel. Roper v. Cain**, 99-2173 (La. App. 1st Cir. 10/26/99), 763 So.2s 1, 5 (*per curiam*), writ denied, 2000-0975 (La. 11/17/00), 773 So.2d 733.[37]

The Louisiana Supreme Court then likewise denied relief, holding:  "Denied.  Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  As to his remaining claims, applicant fails to satisfy his post-conviction burden of proof.  La.C.Cr.P. art. 930.2."[38]

Because petitioner's ineffective assistance of counsel claims were denied on the merits, and because such claims present mixed questions of law and fact, petitioner is entitled to federal habeas relief on the claims only if he shows that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the

---

[36] Rec. Doc. 16-4, pp. 53 (Order).  The fact that the court did not expressly address all of petitioner's claims is of no moment.  When a state court rejects a claim without expressly addressing that claim, there is a rebuttable presumption that the claim was nevertheless adjudicated on the merits.  See Johnson v. Williams, 568 U.S. 289, 298-301 (2013).
[37] State v. Johnson, No. 2018 KW 1220, 2018 WL 5503674 (La. App. 1st Cir. Oct. 29, 2018).
[38] State v. Johnson, 279 So. 3d 371 (La. 2019).

inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then

explained:

Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

Id. at 105 (emphasis added; citations omitted).  Therefore, on habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to any aspect of petitioner's ineffective assistance of counsel claims.

As to petitioner's contention that his trial counsel was ineffective for failing to "move to suppress the DNA evidence obtained from the Petitioner without a search warrant," petitioner appears to be referring to the buccal swab used to collect his DNA.  However, that DNA sample was procured as the result of a motion "to secure an oral saliva swab from Christopher Johnson to be brought to the Louisiana State Police Crime Lab as a reference sample" which was filed with and granted by the state criminal court on August 13, 2009, in the proceedings concerning the prosecution of petitioner's co-defendant, Kelvin C. Thomas, for use in connection with *that* prosecution. [39]  In the answer in this proceeding, respondent explains:

> This respondent's motion to obtain the petitioner's DNA was filed in the matter of State of Louisiana v. Kelvin Thomas, 21st Judicial District docket number 98313.  This motion was utilized, rather than a search warrant, because the petitioner pled on November 19, 2003 and agreed to cooperate in the Kelvin Thomas trial.  Respondent would draw this Court's attention to the Boykin colloquy contained in the trial court minutes dated November 19, 2003.  The minutes indicate that the defendant was represented by counsel, was placed under oath, was informed of his constitutional rights, and waived those rights.  It is undisputed that 1) the reference swab taken from the petitioner was done so for the trial of Kelvin Thomas, 2) it was taken at a time when the petitioner had entered a plea and agreed to testify against Mr. Thomas, and 3) it was done when the petitioner was an inmate in the Louisiana Department of Corrections. [40]

---

[39] Rec. Doc. 16-4, p. 56-57 ("Motion and Order to Secure Physical Evidence").
[40] Rec Doc. 16, p. 17 (footnotes omitted).

Therefore, respondent argues that although he "agrees that the DNA reference swab was taken without a warrant," no warrant was necessary because the sample "was seized when the petitioner had no expectation of privacy or Fourth Amendment protections."[41]

Jurisprudence does indeed recognize that incarcerated, convicted felons have diminished privacy rights, and, therefore, statutes which compel collection of their DNA do not violate their Fourth Amendment rights. Groceman v. United States Department of Justice, 354 F.3d 411 (5th Cir. 2004); Velasquez v. Woods, 329 F.3d 420 (5th Cir. 2003); see Michael B. Mushlin, 2 Rights of Prisoners § 9:34 (5th ed. Sept. 2020 update) ("Over the past few years, deoxyribonucleic acid (DNA) testing has become a major part of criminal law. All 50 states currently allow some form of DNA testing of designated sets of convicted offenders. In October 1998, a federal database was established that contains samples from convicted felons known as the Combined DNA Information System (CODIS). With the establishment of these inclusive databases, the courts have seen an increase in Fourth Amendment challenges to this type of legislation. Although the databases seem to be very intrusive of a person's privacy rights, generally, these schemes have been upheld against Fourth Amendment attacks." (footnotes omitted)). The United States Supreme Court has even held that the warrantless collection of buccal swab DNA evidence from mere *arrestees* is "a legitimate police booking procedure that is reasonable under the Fourth Amendment." Maryland v. King, 569 U.S. 435, 466 (2013).

Because courts have routinely held that the warrantless collection of DNA samples from inmates is constitutionally permissible, the Court finds that there would have been little chance

---

[41] Id. at p. 13.

that any challenge to the admissibility to the DNA evidence based on the manner of its collection in this case would have succeeded, especially given petitioner's status as a convicted inmate at the time it was collected, the reasons for which it was collected, and, most importantly, the fact that it was obtained pursuant to an express order of a criminal court in the co-defendant's separate prosecution. Therefore, the undersigned cannot find that counsel performed deficiently by failing to challenge the warrantless nature of the buccal swab's procurement or that petitioner suffered any prejudice from counsel's failure to pursue such a quixotic quest.

Petitioner's next contention is that his trial counsel was ineffective for failing to "move to suppress the statement where the Miranda warnings given in the aftermath of interrogation did not lead the defendant to know that he had a genuine right to remain silent."[42]  Specifically, he opines:

> Petitioner argues herein that as a result of the way the interrogation was conducted in his case, … he … was not fully aware of his Fifth Amendment rights. The Petitioner does not argue that there was no motion to suppress the statement at all but prior to the giving of his statement he was held in a very hostile environment because of the charge against him and the detective was able to benefit from his fear of retribution for the crime and past dealings with that particular office of law enforcement.[43]

The record reflects that defense counsel did in fact file a motion to suppress petitioner's statement, arguing that "[t]he statement(s) taken from [petitioner] should be suppressed as he was denied food, water and sleep and was made promises of leniency by law enforcement in order to obtain such statement(s)."[44]  A hearing on that motion was held on October 30, 2001.[45]  At that hearing, Detective Sergeant Gary Baham testified that he advised petitioner of his <u>Miranda</u> rights on *three* separate occasions:  first at the Independence Police Department where petitioner was

---

[42] Rec. Doc. 1-1, p. 4.
[43] <u>Id.</u> at pp. 13-14.
[44] Rec. Doc. 16-1, p. 120 ("Motion to Suppress").
[45] Rec. Doc. 16-2, pp. 14-55 (transcript).

initially taken and briefly detained immediately after being apprehended;[46] a second time a few hours later after he was transported to the Tangipahoa Parish Detectives' Division;[47] and a third time shortly thereafter before he gave his recorded statement.[48]  Baham further testified that no inducement or coercion was used to obtain the statement:

> Q.     At any time during the contact with Christopher Johnson did you offer him or promise him, or in any way indicate to him that he might gain some advantage by giving you a statement?
>
> A.     No, sir, I didn't.
>
> Q.     Did you or anyone else threaten him or coerce him in any fashion in order to give you a statement?
>
> A.     No, sir.
>
> Q.     Did anyone else, to your knowledge, offer or promise him anything in return for giving this statement?
>
> A.     No.
>
> Q.     Did you ever tell him anything like you would go to bat for him and get the charge reduced or any of that kind of thing?
>
> A.     No, sir.
>
> Q.     Either on the tape or off the tape?
>
> A.     No, sir.[49]

Baham further testified:

> Q.     During this period of time when Mr. Johnson was in custody, from shortly after the robbery occurred until 3:44 a.m., when you finished getting his statement, was he allowed to use the bathroom or take care of his personal bodily functions in any way?

---

[46] Id. at pp. 18-20.
[47] Id. at pp. 22-23.
[48] Id. at pp. 24-25.
[49] Id. at p. 26.

A.    Yes, sir, while at the North-end Detective's Office.  I didn't have a lot of control over the Independence Police Department because, like I said, I left. First-hand knowledge that I'm aware of at the North-end Detective's Office he was given water, he was allowed to smoke, and if I remember correctly he may have went to the restroom maybe once or twice.

Q.    Did he ever tell you that he was hungry or that he wanted any food or anything of that nature?

A.    No.[50]

Petitioner himself also testified at the suppression hearing, and he conceded that he was given water,[51] did not ask for food,[52] and was not struck or threatened by anyone.[53]  He further conceded that was not mistreated at the sheriff's office, although he complained that, during the brief time he was at the Independence Police Department, the police officers there said mean things to him:

Q.    Did they treat you okay?

A.    Yeah, once I got to the sheriff's office they did.

Q.    You were kind of concerned about being at the Independence Police Department?

A.    Yes, sir.

Q.    Anybody mistreat you there?

A.    All of them.

Q.    How did they mistreat you?

A.    They kept saying they knew I killed him, you know.  Raymond Jackson already don't like me.  He's frequently stalking me all the time.[54]

---

[50] Id. at p. 27.
[51] Id. at pp. 50-52.
[52] Id. at pp. 51-52.
[53] Id. at pp. 52-53.
[54] Id. at p. 52.

Based on the record, it is evident that petitioner was repeatedly advised of his <u>Miranda</u> rights before he gave his statement. Therefore, his contention that he was unaware of his rights is meritless. As to any suggestion he was nevertheless coerced to waive those rights as a result of harsh treatment he was forced to endure before giving his statement, that suggestion is ludicrous. The length of the interrogation was not unduly long,[55] and the conditions of his confinement during that period were not egregious – he was given water, offered bathroom breaks, allowed to smoke, and did not request any food that he was denied. Moreover, even if the officers at the Independence Police Department made unkind remarks to him, his statement was given *after* he was removed from that environment and transported to the Tangipahoa Parish Detectives' Division.

In light of the foregoing, it is evident that counsel filed a motion to suppress and that motion was fully and adequately litigated. The mere fact that the motion was denied is not indicative of ineffective assistance – rather, the motion was denied because it was ultimately meritless, not because counsel performed deficiently.

As to petitioner's next contention that his trial counsel was ineffective for failing to "object to the confrontation violation when the DNA expert who did not conduct the examination testified to the results," that contention warrants little attention. As already explained in detail *supra*, there was no Confrontation Clause violation in this case. Therefore, any objection on that basis would have been meritless. "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." <u>Clark v. Collins</u>, 19 F.3d 959, 966 (5th Cir. 1994).

---

[55] According to Baham, he first encountered petitioner at the Independence Police Department and read him his rights for the first time at approximately 12:21 a.m. Baham then took petitioner's taped statement only approximately three hours later, with the statement concluding at 3:44 a.m. See <u>id.</u> at p. 19 and 24-27.

As to petitioner's contention that one of his attorneys, Vanessa Williams, labored under a conflict of interest because she had previously served as a prosecutor in the case, that contention is, at first blush, troubling.  Unlike in a normal ineffective assistance of counsel claim in which the standard two-pronged Strickland analysis applies, ineffective assistance claims based on a conflict of interest are different.  Importantly, a petitioner "who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980).  However, before a petitioner can benefit from that exception to the prejudice requirement, he must *first* show "that his counsel *actively* represented conflicting interests," because that serves as "the constitutional predicate for his claim of ineffective assistance."  Id. at 350 (emphasis added).  In other words:  "[T]he *possibility* of conflict is insufficient to impugn a criminal conviction.  In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an *actual* conflict of interest *adversely affected* his lawyer's performance."  Id. (emphasis added).

Here, respondent does not contest that Vanessa Williams previously worked for the District Attorney's Office or that she on occasion appeared on the behalf of the prosecution in this case.  However, respondent argues that her involvement was tangential and involved no substantive step in the prosecution.

Respondent argues that the only clear reference in the record to Williams while she was a prosecutor concerns a court appearance on June 13, 2012.  However, according to the record, the

only action which occurred on that date was that a sanity commission hearing was continued.[56] Nothing of consequence occurred; in fact, neither petitioner nor his counsel was even present.

The undersigned has located one other reference to a "Ms. Williams" in a minute entry from July 14, 2010. That minute entry concerns the motion to withdraw petitioner's original guilty plea; however, again, nothing of substance occurred on that date. Rather, the minute entry reflects merely that "Ms. Williams moved for a contradictory hearing prior to the Court's ruling," and a motion date was set for October 5, 2010.[57]

There being no other references in the record to Williams' role as a prosecutor, and petitioner having produced no evidence that she played a substantive role in his prosecution, the Court must conclude that any role she played in the prosecution was nominal at best. Therefore, it simply cannot be said that she "actively" represented conflicting interests in this matter so as to warrant a presumption that the defense was prejudiced by virtue of her prior employment by the District Attorney's Office.[58]

Lastly, as to petitioner's contention that his appellate counsel was ineffective for failing to raise "meritorious claims," specifically ones challenging the admissibility of petitioner's statement and the manner in which the DNA evidence was obtained. Obviously, appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested

---

[56] Rec. Doc. 16-1, p. 14 (minute entry) ("No appearance was made by accused or by attorney. State represented by VANESSA WILLIAMS. SANITY COMM HEARING continue to August 1st 2012 at 09:00.")

[57] Id. at p. 12.

[58] Moreover, in any event, the state district court made a salient point in rejecting this claim, namely that, due to the sequence of events, any conflict here would have potentially harmed the prosecution, not the defense. When defense counsel switches sides and becomes a part of the prosecution team, then, obviously, that switch could conceivably result in confidential defense information being improperly disclosed to the state. Here, however, that sequence was reversed: it was a prosecutor who switched sides, joining the defense team. If Williams then improperly shared confidential information with her new client, it would have been information she gained through her exposure to the prosecution's case, not vice versa. See Rec. Doc. 16-4, pp. 53 (Order).

by defendant)." West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996). Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983). Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." Id. at 753. As a result, when assessing a claim alleging ineffective assistance of appellate counsel, the court looks to whether the issues ignored by appellate counsel were "clearly stronger" than the issues actually presented on appeal. See, e.g., Diaz v. Quarterman, 228 F. App'x 417, 427 (5th Cir. 2007); accord Smith v. Robbins, 528 U.S. 259, 288 (2000).

In the direct appeal in this case, appellate counsel raised three claims: (1) petitioner's right to confront his accuser was violated at trial; (2) the trial court erred in admitting into evidence a gun that was found in a burn pile several years after the offense; and (3) the trial court erred in denying the motions in arrest of judgment, for new trial, and for post-verdict judgment of acquittal. Although those claims lacked merit, the claims petitioner now suggests should instead have been brought concerning his statement and the DNA evidence are certainly no stronger. For the reasons already explained in detail in this opinion, neither the statement nor the DNA evidence was improperly admitted. Because any appellate claims challenging the admission of that evidence would have been meritless, appellate counsel cannot be deemed ineffective for failing assert such claims.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the United States.  He has not made that showing in the instant case with respect to any aspect of his claims. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

### RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Christopher Johnson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[59]

New Orleans, Louisiana, this ___26th___ day of January, 2021.


_____
**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[59] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.